327 P.2d 253

Vinal MILLETT, Plaintiff and Respondent,

v.

Gloria LANGSTON, Defendant and Appellant.

No. 8750.

Supreme Court of Utah.

June 30, 1958.

---

3. 1952, 122 Utah 151, 247 P.2d 277.

H. Byron Mock, Robert L. Cranmer, Robert L. Schmid, Salt Lake City, for appellant.

Dansie & Ellett, Murray, for respondent.

WORTHEN, Justice.

Appeal from the trial court's finding that plaintiff and defendant entered into a partnership agreement for the construction and running of a trailer court, from a judgment for plaintiff for the sum of $781.-36, being one-half of the profits on the operation of the trailer court, and from the judgment of the court for distribution of the purported partnership assets.

In Crockett v. Nish,[1] this court said:

"Since this is a suit in equity, it is our duty under Art. VIII, Sec. 9 of the Constitution, to review the facts. In examining the transcript to determine what our conclusions from the evidence will be we are to make an independent analysis of it. If at the end of the investigation we are in doubt or even if there be a slight preponderance in our minds against the trial court's conclusions we will affirm."

Plaintiff's various and irreconcilable positions evidenced in his pleadings, his deposition, his affidavit in support of his motion for the appointment of a receiver, his answers to interrogatories and his testimony while on the witness stand are so fantastic, and so vacillating as to compel the conclusion that the same is unworthy of credence. To fully demonstrate the extent of his contradictions and inconsistencies would require setting out in full all of

---

1. 106 Utah 241, 147 P.2d 853, 854.

these portions of the record, but we are of the opinion the following will suffice.

The cornerstone of the claimed partnership as contended for by plaintiff is that the land purchased by defendant at Moab on which the trailer court was built was partnership property in which he owned a one-half interest.

In paragraph 2 of his complaint he alleged:

"On or about April, 1954, the Plaintiff and Defendant entered into a partnership agreement to purchase certain property located in the city of Moab, Utah, from a person named Frank Peterson. Said property consisting of fifteen (15) acres of ground at the price of One Thousand One Hundred Dollars ($1,100.00) per acre."

To the following interrogatories the plaintiff made the following answers:

"16. Under the terms of the alleged partnership agreement what interest do you state was to be received by you in the real estate from the Defendant?

Ans. "One-half. (½).

"17. Who was to make the payments on such property and who was to be responsible for seeing that such payments were made, both before and after you terminated your connection with the River-sands Trailer Court in about July, 1955?

Ans. "Gloria Langston"

"57. What interest in real estate do you claim you are entitled to receive under the alleged partnership agreement? And in what properties?

Ans. "One-Half (½), the River Sands Trailer Court."

He testified that he and defendant purchased five acres of land at Moab, but that defendant took the property in her own name; that when the purchase was made he requested that it be put in the names of plaintiff, defendant and plaintiff's brother, Ira Millett. He further testified that the original arrangement was for defendant to put up all the money, for his brother Ira to furnish the cabins, and he would go down and pioneer the project, run the court, build the buildings and collect the money, and each would have a one-third interest. His deposition discloses the following testimony.

"Q. And it was your contention that at that time you wanted the property put in all three names? A. Yes.

"Q. Did you put any money up at that time? A. No. No, I didn't put any money up.

"Q. Did Ira put any money up? A. No, he didn't put any money. He just put the cabins up.

"Q. The only person who paid any money to the real estate people was * * * A. Was her, and that was the arrangement. That's why we had her. *She couldn't do nothing else.* She said she had a little money." (Emphasis added.)

Yet plaintiff testified that he borrowed $100 and made down payment on the additional eight or nine acres of land. But when the receipt was issued for the down payment, it was made in favor of defendant. Plaintiff failed when he had the chance to provide for this land to be taken in his name.

Plaintiff's story as to how he became entitled to a half interest instead of a third interest was given while on the witness stand as follows:

"Q. Well, can you tell me how you two were going to share in any profits? A. Well, after she let Ira go— see, he worked, or after he shipped the cabins down, then approximately a couple of months she came up after some more lumber from him, so—see, *he's supposed to be third owner then,* and so she came up after lumber, and he didn't have that kind of lumber ready, so she took the other, but it made her mad, so she told him he was out of it now, he didn't have any part of the business, but never offered to settle nor never settled for it at all, so he just out, so she told me, 'Now,' she says, 'you and I will go in half on it. We will be half,' and I told Ira, 'Well, all I can do, and then I can fix it up with you later on my part. That's all we can do now.'" (Emphasis added.)

Plaintiff admitted that he was not present and that the above statements so far as Ira is concerned were hearsay, and defendant denied that any such conversation occurred.

Plaintiff's version of how he became entitled to the one-half interest is no more fantastic and incredible than the balance of his stories. He acquired the larger interest by defendant's being obliged to take over Ira's obligations but without her getting Ira's interest in the venture. He further testified that the partnership agreement was made in the Allen Real Estate office and he, his sister, Roxie Boshard, and defendant were present. Mrs. Boshard called as a witness for the plaintiff testified that she was never in the real estate office. She further testified that she rode to Moab with plaintiff and defendant; that from what she heard discussed plaintiff was just helping.

Plaintiff testified at the trial as follows:

"Q. Now, is it your contention that Gloria Langston was to put up all the money and that you were to take the money out of the proceeds of the operation of the motor court for your expenses, that you did not send her any

money, and that she was still to give you one-half interest in the real estate? A. Yes because we was working to get *the trailer camp in operation so we could make some money.* * * *

"Q. And you say she should have given you one half of the $16,000.00 property without your putting anything into it except spending fifteen months down there? A. Well, we were putting in time and work.

"Q. And you were living off of the income that came in? A. Absolutely.

"Q. And in addition you were to get one half of the property? A. Yes sir.

"Q. Were you also to take over the *obligation* after that fifteen months *to pay one half* of the payments? A. We was making the trailer camp make the payments.

"Q. You were not to *put up any money of your own at any time then?* A. No." (Emphasis added.)

Plaintiff at no time either in his pleadings, deposition, interrogatories or testimony claimed anything less than one-half interest in the River Sands Trailer Court, including the real estate and the cabins and improvements. Never did he claim that he was a partner with her in the ownership of the cabins and improvements on the property alone. Nevertheless the trial court found that the parties entered into a partnership agreement for the construction and running of a trailer court; and after finding plaintiff entitled to $781.36 as his share of the profits, ordered the partnership dissolved and the real estate and the improvements separately appraised, and allowed defendant 30 days to purchase plaintiff's one-half interest in the partnership assets (consisting of the buildings and improvements on the land)—and in the event defendant failed to pay plaintiff, then plaintiff was given the right to pay defendant the appraised value of the land plus one-half of the value of the buildings and improvements. If plaintiff failed to purchase from defendant, the same was ordered to be sold and the proceeds divided—one-half of the appraised value of buildings and improvements to plaintiff and the balance to defendant.

It is unnecessary to point out that the attempted dissolution was improper, and not in accordance with the statute as to occupying claimants.

Plaintiff testified that he was to go down to Moab and put it over—that he was to go down there and stay and run that part of it.

The record discloses plaintiff's background to be as follows:

Plaintiff had never run a trailer court or motor court or any business of that nature. Before plaintiff went to Moab in

May, 1954, he had been out of work six weeks and was drawing unemployment compensation; he had no money, no savings; he had never held a job longer than 10 months at a time. He was a carpenter by trade and had previously failed in three business ventures that he had undertaken. But he was the favorite brother of defendant's mother and had vision, and some to spare. Defendant had given him $60 each month in March, April and May, 1954, to prevent his losing his automobile.

In May, plaintiff went to defendant and told her he thought there was a chance to make some money by getting a trailer court at Moab, Utah, or leasing or renting some land to put one on. He suggested to defendant that she purchase property and employ plaintiff to manage it. Plaintiff, defendant and defendant's mother went to Moab at plaintiff's suggestion to look the situation over.

Defendant testified at the taking of her deposition:

" * * * *  *I didn't go into any type* of partnership with him on any property that I know of. I mean that wasn't even talked about or considered. * * *"  (Emphasis added.)

Defendant was then asked the following questions, and gave answers as follows:

"Q. All right, now, what kind of arrangements did you have with Mr. Vinal Millett to come down there and spend his time? A. There were no definite arrangements or agreements. The only thing was that we didn't know what was going to happen or how things would go or how the business would do. What we talked about was opening a trailer court and then possibly building cabins and renting them, and if we made good, then that was all right. * * *"

"Q. * * * *What arrangements were made with him to compensate him for his time?* A. He was to collect the money and do the work, and that was to compensate him. He was already on unemployment compensation. He had been for some time. * * * I had helped with a loan that he had which included his car and some other loan which was sixty dollars a month plus his unemployment compensation. I had been helping him with it. I wanted to help Vinal. * * * I wanted to do something for him. * * *"

"Q. How much did you agree to pay him? A. I didn't agree to pay him anything. We didn't know what kind of a business we were going to have. There was no agreement on anything because we didn't know what we were going to run into; we didn't know what type of business. Vinal said, 'I will take a chance on it.' He said, '*I think we can get enough trail-*

*ers in to pay me, to keep me, and maybe enough to send my wife some money*'; and during that period of time while he got started, I did give him sixty dollars a month, and Mother gave his wife groceries. We tried to help them all we could.

"Q. Now, if this developed into a good business venture that would make money, were you to get your original investment back? A. I was—with the business itself, then Vinal and I would, *if there were good profits, then we were to divide the profits*." (Emphasis added.)

When asked what discussion she had with plaintiff relative to the business venture defendant answered:

"A. Nothing was definite. We were going down trying to find—we went down to try to find some place to put up a business. Whether we were to rent it or lease it we didn't know, but no definite—anything was talked about. We thought if we could maybe put up some type of business to get some trailer courts in or something, *that it might work into a good enough business, so we might be able to share profits from the business*." (Emphasis added.)

When asked what plaintiff said, defendant testified:

"He said, 'Well, we both take a chance on it.' He said 'I will take what receipts are coming off, and I just need some money to send to my wife and to live on a little bit, and we will see if we can work it up into a business where we might be able to make some money between both of us—from the business itself.' "

We are of the opinion that no partnership existed between plaintiff and defendant for an equal sharing of the profits of the trailer court business. The contention of plaintiff that a full fledged equal partnership existed in the entire trailer court and cabins, including the land, and that his rights vested without his doing anything, discredits his entire claim.

We are of the opinion from the mass of indefinite testimony that no partnership was ever formed, but that a business arrangement was entered into which was preliminary to and constituted a condition precedent to any partnership. The only conclusion warranted from the testimony and the relationship of the parties is this.

Defendant was willing to purchase the land and pay for the materials for a trailer court and plaintiff was to build it up and stay there and do the work and operate it. He was to collect the money and *that was to compensate him*. The conclusion is inescapable that he was not to acquire any interest in the business until the business

was built up to where it was a good business that would make money and then, and only then, was there to be a relationship that would constitute a partnership. However, the plaintiff took for a period of 13 months all that was collected. He left defendant to meet the major bills; he hired others to do his work. He gave rent for work and allowed credit on lots of defendant for work that he should have done. Besides failing to report to defendant that he took in $5,569.39 prior to July 20, 1955, a period of about 13 or 14 months, he also gave free rent to others for doing what he was supposed to do. It cannot be questioned that plaintiff failed to account to defendant for at least $3,500 for said period, including money taken from receipts to meet his car payments in the amount of $45.50 per month for 11 months, and $375 to send to his wife. Plaintiff represented and testified that he put in his entire time at the trailer court, except for working five or six weeks on the new post office at Moab. He kept the money from this employment, except for the payment of one small bill, while paying from the trailer receipts a woman to run the trailer court. The record shows that during his entire period at the trailer court he never personally collected rentals but gave a woman free rent to do this for him. The record also shows that plaintiff went prospecting and was away from the court a great deal.

He testified as follows on direct examination:

"Q. Now, had your wife been living in Salt Lake City all this time? A. Yes. Yes.

"Q. You had been living away from her? A. Yes sir.

"Q. And you had been away from her how many months? A. Fifteen.

Yet on cross-examination plaintiff testified:

"Q. Did you take any other amounts from the River Sands Trailer Court operation? A. Well, yes, a few trips. When I would come up to Salt Lake here, back up here once in a while, I would use gas money.

"Q. How many trips did you make during the fifteen months? A. Oh, I would say—I don't know—half a dozen or maybe more. I didn't keep track.

"Q. What do you estimate each one of them cost? A. Oh, about five or six dollars."

Plaintiff testified at the taking of his deposition that he took in an average of about $240 per month—"and half starved to death." Yet Exhibit 7 shows receipts for the last five months of 1954 in the amount of more than $2,400 without considering money not receipted for and without charging himself for the free rent given for work done.

Plaintiff with a free hand took in money not accounted for, detailed a sad story of

starving to death and living away from his wife for 15 months, when in truth he probably had more money during his sojourn there than during any other equal period during his life, and made the trailer court pay for six or more visits to his wife and lived the life of Riley while he paid others with free rent to do what he was expected to do. During the last five months of 1954, he received and kept at least $1,200 that he didn't show he received.

Before we can find that a partnership existed we must swallow his incredible story that defendant would invest over $16,000 in real estate, expend in excess of $4,000 for materials for cabins and other improvements and let plaintiff in as a full partner in the entire project while he was to put up nothing except his *know-how* and be entitled to one-half of the $20,000 investment because he had failed to do what he was supposed to do and used her property to pay others to do what he was supposed to do. His brother Ira helped build the first cabin, and another brother worked six weeks, and both were paid by defendant. He had two carpenters build the sixth cabin and defendant gave them a building lot and free rent in payment. The electrical work, the plumbing work and the road construction work were contracted out by plaintiff and paid for by defendant. Defendant painted the cabins herself.

We are convinced that if a partnership ever existed, it was dissolved in July, 1955, and each party released the other. The conclusion that all accounts had been settled and terminated between plaintiff and defendant at that date seems irresistible.

Plaintiff testified that he just wanted to take a rest for a month or two and then return. Yet he testified that within a week after his return to Salt Lake City he got a job and worked at that job until November, 1955.

Plaintiff took all his personal belongings with him, including his house trailer and two cars. Defendant testified that plaintiff had said he didn't want to stay there any longer. " * * * anyway, he wanted to come home, and he told me he did. He was sick of it. He didn't want any more to do with it." She further testified:

"So as time went on, I began to see that he was hiring more and more work done, * * *. He was off prospecting quite a bit of the time, or was puttering around doing other things, and he didn't receive the—I mean he didn't even receive the receipts from the trailer court. He gave rent for that, and I got a little disgusted the last few time I went down, and I said to Vinal, I said, 'Vinal,' I said, 'it doesn't seem as though you are doing yourself much good or me either.' I said, 'You are hiring all your work done,' and I said, 'I may as well take over and run it because I can run it from in Salt

Lake as good as you are doing here. * * *' "

"So I went down—oh, maybe the last week in June I went down, and he was working in the post office, and he had someone taking care of the receipts that I didn't feel was capable of doing it, *so I fired her and started taking over the receipts,* and so I talked it through with Vinal. I said, 'Well,' I said, 'you are sick of it here,' and I said, 'nothing seems to be happening, and you would rather go back to Salt Lake.' I said, *'Let's just terminate everything,* and you go back to Salt Lake' and he said, 'Well, that's fine with me. That is real fine.' "

"So I helped him, and my friend who was there with me, Miss Em Ullock, she had been helping me. Both of us helped him get ready, and I drove his car, his newer car, at the time, and he drove a real older car that he had and pulled his trailer and Miss Ullock drove the automobile I had, and the three of us came back together." (Emphasis added.)

Emma Ullock testified that she was in Moab for some time prior to the time plaintiff left.

"Q. During that period did you hear any discussions of Vinal Millett leaving? A. He—yes, he said he wasn't happy, he was tired of Moab and had had about all he wanted of that kind of life.

"Q. Did he indicate that he expected to return? A. Not that I know of."

There is no evidence that there was an accounting between plaintiff and defendant at the time plaintiff left. Plaintiff did not testify to any accounting. As a matter of fact, plaintiff did not consider that he had to account to defendant for the receipts from the trailer court—nor did he ever do so. But it now appears that he received not less than $1,200 more than he ever admitted. But it was his contention that all that was taken in was his to keep. He never turned a dollar over to defendant.

The judgment is reversed and remanded to the district court with directions to dismiss plaintiff's complaint and discharge defendant and the property at Moab from any claim whatsoever of the plaintiff. No costs awarded.

McDONOUGH, C. J., and WADE, J., concur.

HENRIOD, J., concurs in result.

CROCKETT, Justice.

I dissent: It seems to me that the view taken by the trial court that the parties entered into a joint venture for their mu-

tual profit is not unreasonable in the light of the circumstances disclosed by the evidence. It was a family affair, and as frequently occurs in matters of that character, the parties did not take the trouble either to come to a clear understanding, or to reduce their plan to writing. They simply went along pursuing the general objective of developing this business with the understanding and hope that it would eventually work out to their mutual advantage. As is also not too unusual in such situations, it didn't.

At the trial the parties were not in disagreement as to the above general purpose, but as appellant states in her brief, their testimony "shows substantial disagreement on the questions" in dispute in this lawsuit: i. e., what business arrangement existed between them; had it been terminated; and what were their present obligations.

After hearing all of the evidence the trial court made certain observations reflecting his views of the facts as shown by the evidence:

" * * * The parties were going down for the purpose of going into a business and hoping that they were both going to prosper by it * * *."

" * * * I am of the opinion * * * that it bounced a little bit off side * * * when the lady had to buy the land * * *."

" * * * His labor ought to be offset by her buying the material that went on the ground, and I think they had an account between themselves * * * at the time he left down there, but since then we ought to figure an accounting * * *."

The court thus indicated that he thought there was a joint venture for mutual profit in the entire project, except that it was originally planned that they would rent land rather than buy it, and that when the defendant was required to buy the land, it did not conform to their original intention. In that connection he said: "If those people could have rented a space down there or taken a lease on the ground, there would have been a partnership, and I haven't any doubt about that at all."

Based upon the above observations he concluded that the fair thing to do would be to " * * * make her [plaintiff] whole with the land, and then the partnership go as it was intended."

In accord with the above view, the trial court denied the plaintiff's claim to one-half interest in the land, awarding it entirely to the defendant. As to the rest of the transaction he regarded it as a partnership.[1] He assumed that the parties had acquiesced in a balance of accounts when the plaintiff left; but required the defendant to account to plaintiff for one-half the profits realized after that time, resulting

1. For Chancellor Kent's classic definition, and others, see 40 Am.Jur. 126.

in the judgment of $781.36; and also adjudged that plaintiff was entitled to one-half of the value of the improvements placed on the land by his efforts. I am not impressed that the evidence so clearly preponderates against the findings and conclusions of the trial court that the judgment should be reversed.[2]

2. As to the verity to be indulged determinations of the trial court in actions in equity see Nokes v. Continental Mining & Milling Co., 6 Utah 2d 177, 308 P.2d 954.